2015V01424
MP/MS
PAUL J. FISHMAN
United States Attorney
By:  Marion Percell
Assistant United States Attorney
970 Broad Street, Suite 700
Newark, New Jersey 07102
Tel:  973-645-2733
marion.percell@usdoj.gov

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Hon. |
| Plaintiff, | : | Civil Action No. |
| v. | : | VERIFIED COMPLAINT FOR FORFEITURE *IN REM* |
| A TOTAL OF $3,397,230.97 IN UNITED STATES CURRENCY, INCLUDING: | : | |
| | : | |
| $417,866.75 SEIZED FROM VALLEY NATIONAL BANK ACCOUNT NUMBER 41651901, HELD IN THE NAME OF EXCELL BRANDS; | : | |
| $305,070.41 SEIZED FROM BANK OF AMERICA ACCOUNT NUMBER 381031654225, HELD IN THE NAME OF EXCELL BRANDS; | : | |
| | : | |
| $207,104.88 SEIZED FROM BANK OF AMERICA ACCOUNT NUMBER 381004975216, HELD IN THE NAME OF AMBROSIA FRAGRANCE LLC; | : | |
| | : | |
| $22,444.57 SEIZED FROM BANK OF AMERICA ACCOUNT NUMBER 000101470415, HELD IN THE NAME OF WARREN J. BRONSNICK; | : | |
| | : | |

$120,846.17 SEIZED FROM SANTANDER          :
BANK ACCOUNT NUMBER 0752319396,
HELD IN THE NAME OF WAYNE AND              :
DIANE HAMERLING;

                                           :

$17,565.96  SEIZED FROM SANTANDER
BANK ACCOUNT NUMBER 0752029150,            :
HELD IN THE NAME OF WAYNE AND
DIANE HAMERLING;                           :

$8,096.70 SEIZED FROM SANTANDER            :
BANK ACCOUNT NUMBER 0751036013,
HELD IN THE NAME OF WAYNE AND              :
DIANE HAMERLING;

                                           :

$35,776.08 SEIZED FROM JP MORGAN
CHASE BANK ACCOUNT NUMBER                  :
862500825265, HELD IN THE NAME OF
A. ROSENBLUM INC.;                         :

$86,255.64 SEIZED FROM JP MORGAN           :
CHASE BANK ACCOUNT NUMBER
862001782665, HELD IN THE NAME OF          :
BERNARD ROSENBLUM OR LYN
ROSENBLUM;                                 :

$113,677.17 SEIZED FROM UBS BANK           :
ACCOUNT NUMBER MQ09445, HELD IN
THE NAME OF ANDREW JOHN                    :
ROSENBLUM;

                                           :

$70,070.00 SEIZED FROM UBS BANK
ACCOUNT NUMBER MQ1325, HELD IN             :
THE NAME OF LYNNETTE ROSENBLUM;

                                           :

$127,771.58 SEIZED FROM HOMETOWN
BANK ACCOUNT NUMBER 91027593,              :
HELD IN THE NAME OF JEFFREY
KRULEWICH;                                 :

$85,892.55 SEIZED FROM HOMETOWN            :
BANK ACCOUNT NUMBER 1001426,
HELD IN THE NAME OF JEFFREY                :
KRULEWICH;

                                           :

$222,720.00 SEIZED FROM INVESTORS
BANK ACCOUNT NUMBER 2156100712,
HELD IN THE NAME OF JEFFREY M.                     :
KRULEWICH AND NORA J. KRULEWICH;

                                                :

$167,894.00 SEIZED FROM INVESTORS
BANK ACCOUNT NUMBER 2156100720,                    :
HELD IN THE NAME OF JEFFREY
KRULEWICH;                                         :

$47,000.00 SEIZED FROM 401(K)                      :
ACCOUNT NUMBER 13103741, HELD IN
THE NAME OF WAYNE HAMERLING AT                     :
WELLS FARGO ADVISORS;

                                                :

$125,000.00 SEIZED FROM COMMON
ASSET PROGRAM ACCOUNT NUMBER                       :
27279986, HELD IN THE NAME OF
WAYNE C. HAMERLING & DIANNE W.                     :
HAMERLING AT WELLS FARGO
ADVISORS;                                          :

$490,000.00 SEIZED FROM MORGAN                     :
STANLEY BASIC SECURITIES ACCOUNT
398-136591-886, HELD IN THE NAME OF                :
WARREN BRONSNICK AT MORGAN
STANLEY;                                           :

$550,000 FORMERLY HELD IN THE                      :
ATTORNEY TRUST ACCOUNT OF
CALCAGNI & KANEFSKY, ESQS.;                        :

$6,289.00 IN U.S. CURRENCY SEIZED                  :
FROM THE OFFICES OF EXCELL
BRANDS IN PRINCETON, NEW JERSEY;                   :

$10,000.00 IN U.S. CURRENCY SEIZED                 :
FROM THE RESIDENCE OF LUIS
RODRIGUEZ IN PLAINSBORO, NEW                        :
JERSEY;

                                                :

$19,740.00 IN U.S. CURRENCY SEIZED                 :
FROM THE RESIDENCE OF BERNARD
ROSENBLUM IN GREAT NECK, NEW                        :
YORK;                                              :

$23,096.00 IN U.S. CURRENCY SEIZED        :                    Defendants *in rem.*
FROM THE RESIDENCE OF WARREN
BRONSNICK IN CHATHAM, NEW JERSEY;        :
AND
                                          :
$17,053.51 IN U.S. CURRENCY SEIZED
FROM THE RESIDENCE OF WAYNE              :
HAMERLING IN SKILLMAN, NEW
JERSEY,                                   :

       Defendants *in rem.*

       Plaintiff, United States of America, by its attorney, Paul J. Fishman,

United States Attorney for the District of New Jersey (by Marion Percell,

Assistant United States Attorney), brings this Verified Complaint for Forfeiture

*in Rem* and alleges as follows, in accordance with Rule G(2) of the

Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture

Actions, Federal Rules of Civil Procedure.

## NATURE OF THE ACTION

       1.    This is a civil action *in rem* to forfeit and condemn to the use and

benefit of the United States the above-captioned property (the "defendant

properties") (1) pursuant to Title 21, United States Code, Section 881(a)(6), as

moneys or other things of value furnished and intended to be furnished in

exchange for a controlled substance or proceeds traceable to such an

exchange; (2) pursuant to Title 18, United States Code, Section 981(a)(1)(A), as

property involved in a transaction or attempted transaction in violation of  Title

18, United States Code, Sections 1956 and 1957, and a conspiracy to commit

such a violation, and property traceable to such property; and (3) pursuant to

Title 31, United States Code, Section 5317(c), as property involved in, or

traceable to property involved in, violations of currency reporting requirements and structuring to avoid currency reporting requirements in violation of Title 31, United States Code, Sections 5322, 5324(a), and 5331.

### THE DEFENDANTS *IN REM*

2.      The defendant properties consist of:

    a.  $417,866.75 seized from Valley National Bank account number 41651901, held in the name of Excell Brands ("subject account Valley 1901");

    b.  $305,070.41 seized from Bank of America account number 381031654225, held in the name of Excell Brands ("subject account BofA 4225");

    c.  $207,104.88 seized from Bank of America account number 381004975216, held in the name of Ambrosia Fragrance LLC ("subject account BofA 5216");

    d.  $22,444.57 seized from Bank of America account number 000101470415, held in the name of Warren J. Bronsnick ("subject account BofA 0415");

    e.  $120,846.17 seized from Santander Bank account number 0752319396, held in the name of Wayne and Diane Hamerling ("subject account Santander 9396");

    f.  $17,565.96  seized from Santander Bank account number 0752029150, held in the name of Wayne and Diane Hamerling ("subject account Santander 9150");

    g.  $8,096.70 seized from Santander Bank account number 0751036013, held in the name of Wayne and Diane Hamerling ("subject account Santander 6013");

    h.  $35,776.08 seized from JP Morgan Chase bank account number 862500825265, held in the name of A. Rosenblum Inc. ("subject account JPMC 5265");

    i.  $86,255.64 seized from JP Morgan Chase Bank account number 862001782665, held in the name of Bernard Rosenblum or Lyn Rosenblum ("subject account JPMC 2665");

j.  $113,677.17 seized from UBS Bank account number MQ09445, held in the name of Andrew John Rosenblum ("subject account UBS 9445");

k.  $70,070.00 seized from UBS Bank account number MQ1325, held in the name of Lynnette Rosenblum ("subject account UBS 1325");

l.  $127,771.58 seized from Hometown Bank account number 91027593, held in the name of Jeffrey Krulewich ("subject account Hometown 7593");

m. $85,892.55 seized from Hometown Bank account number 1001426, held in the name of Jeffrey Krulewich ("subject account Hometown 1426");

n.  $222,720.00 seized from Investors Bank account number 2156100712, held in the name of Jeffrey M. Krulewich and Nora J. Krulewich ("subject account Investors 0712");

o.  $167,894.00 seized from Investors Bank account number 2156100720, held in the name of Jeffrey Krulewich ("subject account Investors 0720");

p.  $47,000.00 seized from 401(k) account number 13103741, held in the name of Wayne Hamerling at Wells Fargo Advisors ("subject account Wells Fargo 3741");

q.  $125,000.00 seized from Common Asset Program account number 27279986, held in the name of Wayne C. Hamerling & Dianne W. Hamerling at Wells Fargo Advisors ("subject account Wells Fargo 9986");

r.  $490,000.00 seized from Morgan Stanley Basic securities account 398-136591-886, held in the name of Warren Bronsnick at Morgan Stanley ("subject account Morgan Stanley 1886");

s.  $550,000 in United States currency formerly held in the attorney trust account of Calcagni & Kanefsky, Esqs.;

t.  $6,289.00 in United States currency seized from the office of Excell Brands, LLC, 3 Independence Way, Suite 114, Princeton, New Jersey;

- 6 -

u.  $10,000.00 in United States currency seized from the residence of Luis Rodriguez in Plainsboro, New Jersey;

v.  $19,740.00 in United States currency seized from the residence of Bernard Rosenblum in Great Neck, New York;

w.  $23,096.00 in United States currency seized from the residence of Warren Bronsnick in Chatham, New Jersey; and

x.  $17,053.51 in United States currency seized from the residence of Wayne Hamerling in Skillman, New Jersey

(collectively the "defendant properties").

3.      The defendant properties are currently in the possession of the United States.

## JURISDICTION AND VENUE

4.      Plaintiff brings this action *in rem* in its own right to forfeit and condemn the defendant properties.  This Court has jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355(a).

5.      This Court has *in rem* jurisdiction over the defendant properties under 28 U.S.C. 1355(b).  Upon the filing of this Verified Complaint, plaintiff requests that the Clerk of the Court issue an arrest warrant *in rem* pursuant to Supplemental Rule G(3)(b)(i), which plaintiff will execute upon the defendant properties pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c).

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1), because the acts or omissions giving rise to the forfeiture occurred in this district.

7.     Venue is also proper in this district pursuant to 28 U.S.C. § 1395 as to all of the defendant properties located in the District of New Jersey.

## BASIS FOR FORFEITURE

8.     The defendant properties are subject to forfeiture (1) pursuant to Title 21, United States Code, Section 881(a)(6), as moneys or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or proceeds traceable to such an exchange, (2) pursuant to Title 18, United States Code, Section 981(a)(1)(A), as property involved in a transaction or attempted transaction in violation of Title 18, United States Code, Sections 1956 and 1957, and a conspiracy to commit such a violation, and property traceable to such property, and (3) pursuant to Title 31, United States Code, Section 5317(c), as property involved in, or traceable to property involved in, violations of currency reporting requirements and structuring to avoid currency reporting requirements in violation of Title 31, United States Code, Sections 5322, 5324(a), and 5331.

## FACTS

9.     During the period relevant to this Verified Complaint for Forfeiture *in Rem*:

       a.     Excell Brands, LLC ("Excell Brands") was a business with addresses of 3 Independence Way, Suite 114, Princeton, New Jersey and 295 Durham Avenue, Suite C, South Plainfield, New Jersey.

       b.     Excell Brands did not maintain any place of business outside of New Jersey.

- 8 -

c.      Excell Brands was in the business of distributing perfumes that were imitations or copies (sometimes referred to as "knock-offs") of designer perfumes.

d.      Wayne Hamerling ("Hamerling") was the president of and a part-owner of Excell Brands.

e.      The other part-owners of Excell Brands included Warren Bronsnick ("Bronsnick"), Bernard Rosenblum ("Rosenblum"), Jeffrey Krulewich ("Krulewich"), Andrew Rosenblum, and Andrew Pfau.

f.      Dianne Hamerling was the assistant controller of Excell Brands and the wife of Hamerling.

g.      Alfredo Castaneda ("Castaneda") was the Latin American Sales Director of Excell Brands, and Luis Rodriguez ("Rodriguez") was the domestic salesperson for Excell Brands.

10.     Excell Brands, Hamerling, Dianne Hamerling, Bronsnick, Rosenblum, Rodriguez, Castaneda, and others known and unknown knowingly conspired and agreed with each other and with others:  (1) knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and knowing that the transactions were designed in whole and in part to (A) conceal and disguise the nature, source, ownership, and control of the proceeds of specified unlawful activity and (B) to avoid a transaction reporting requirement under Federal law, to conduct financial transactions affecting interstate and foreign commerce which in fact involved the proceeds of specified unlawful activity, specifically the

transfer, delivery, and other disposition of United States currency involving the proceeds of specified unlawful activity, namely the distribution of narcotics; (2) to engage and attempt to engage in monetary transactions by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, namely the distribution of narcotics; (3) to cause a person engaged in a trade or business who, in the course of such trade or business, received more than $10,000 in coins or currency in one transaction or in two or more related transactions, to fail to file reports as required by law; and (4) to structure and assist in structuring, and attempt to structure and assist in structuring, transactions with domestic financial institutions for the purpose of evading reporting requirements.

11.     From at least October 2012 until at least January 15, 2015, the executives and employees of Excell Brands and their coconspirators laundered narcotics proceeds through Excell Brands' bank accounts.  They accepted United States currency from representatives of drug trafficking organizations and in return shipped apparently clean goods, namely perfumes and related goods, to Latin America, including Mexico and other narcotics source locations. The goods were then converted into local currency and used to pay narcotics traffickers, thus effectively cleaning the drug proceeds for the drug trafficking organizations.

12.    In short, Excell Brands, its executives, its employees, and its coconspirators utilized the Excell Brands bank accounts to facilitate trade-based narcotics money laundering.

13.    On several occasions during the period from October 2012 through January 15, 2015, in the course of its trade and business, Excell Brands received cash in excess of $10,000 in a single transaction.

14.    The cash described in the preceding paragraph was the proceeds of narcotics trafficking, and it was used to pay Excell Brands for legitimate products that would be sold in Latin America, the proceeds of which would be used to pay the narcotics traffickers.

15.    On some of the occasions on which Excell Brands received cash in excess of $10,000, but not all, representatives of Excell Brands deposited that cash into subject account Valley 1901 in amounts in excess of $10,000.

16.    In February 2013, communications among members of a money laundering organization were intercepted in which the telephone facility used by Rodriguez was identified as the number to contact to make arrangements for the delivery of $40,000 in drug proceeds.  The communications further indicated that the delivery would be made at a business.  Based upon records of Rodriguez's communications, that business was Excell Brands.

17.    On April 8, 2013, communications among members of a drug trafficking organization were intercepted in which the telephone number of Excell Brands was passed and identified as that of a business.  A member of the conspiracy indicated that a courier should contact Excell Brands to drop off

$150,000 in drug proceeds and identified the contact person at Excell Brands as "Luis" (referring to Rodriguez).

18.     On April 11, 2013, Excell Brands opened subject account Valley 1901 at Valley National Bank, apparently for the purpose of depositing bulk amounts of narcotics proceeds.  On April 17, 2013, Hamerling, Bronsnick, and Rodriguez deposited $180,000 in cash into subject account Valley 1901.  (This deposit was the culmination of the arrangements described in the preceding paragraph.)

19.     On June 16, 2013, at approximately 2:27 p.m., Rodriguez received an intercepted call from an individual who advised Rodriguez to "be on alert" for communications from an unidentified person regarding "one hundred and fifty five."  The caller was saying that $155,000 would be delivered to Rodriguez to launder.

20.     A few hours later, at approximately 6:08 p.m., Rodriguez received a call from a different individual, whom he arranged to meet later in the day.

21.     At approximately 8:00 p.m., a Hispanic male dropped a large red duffle bag on a corner in New York City.  Moments later, Rodriguez picked up the bag and took it into his apartment building.

22.     At approximately 8:07 p.m., Rodriguez placed a phone call confirming that he had picked up the bag and that he was going to "count it" (the money) when he got to the "company" (Excell Brands).

23.    On June 17, 2013, at approximately 7:38 a.m., Rodriguez carried the large red duffle bag he had picked up the previous day into the offices of Excell Brands.

24.    At approximately 11:07 a.m., Hamerling and Bronsnick entered a Valley National Bank branch, and Hamerling was carrying the same large red duffle bag.

25.    Hamerling and Bronsnick deposited approximately $155,060 in United States currency into subject account Valley 1901 on June 17, 2013.

26.    In December 2013, Dianne Hamerling deposited approximately $49,980 in United States currency into subject account Valley 1901.  It was packaged in vacuum-sealed bags that also contained dryer sheets.

27.    Also in December 2013, Dianne Hamerling made a cash deposit of approximately $269,030 in United States currency into subject account Valley 1901.  The currency was packaged in vacuum-sealed bags that contained mothballs.

28.    Dryer sheets and mothballs are used to camouflage the odor of controlled substances such as cocaine and heroin.

29.    In February 2014, communications among three participants in known drug trafficking and money laundering conspiracies were intercepted. The participants discussed arrangements for a delivery of a bulk quantity of United States currency.  The details of the arrangements included "30" to be taken "to an office" located at "3 Independence Way, Suite 114, Princeton NJ 08540, tel 908-561-1130" (the address and telephone number of Excell

Brands), and the recipients of the instructions were told to "ask for Dianne and for Wayne.  They are white/Americans, they are spouses."  The instructions also identified the name of "the company" as "Excell Brands."

30.    These communications referred to a bulk money transfer of $300,000 in U.S. currency to be delivered to Hamerling and Dianne Hamerling at the office of Excell Brands.

31.    During the period from at least October 2012 until at least January 15, 2015, Excell Brands and its executives and employees did not file a single Report of Cash Payments Over $10,000 Received in a Trade or Business (IRS and FinCEN Form 8300), the form required by Title 31, United States Code, Section 5331, Title 26, United States Code, Section 6050I, and Title 31, Code of Federal Regulations, Section 1010.330.

32.    In addition to receiving and depositing cash in excess of $10,000, employees of Excell Brands also structured the deposit of narcotics proceeds into its bank accounts by depositing currency in amounts that did not exceed $10,000 for the purpose of evading the filing of a currency transaction report.

33.    In addition, deposits of narcotics proceeds that were structured to evade the filing of a currency transaction report were made into an Excell Brands bank account by customers of Excell Brands and by parties unknown to Excell Brands.

34.    Specifically, from at least October 2012 through at least January 15, 2014, cash deposits were made directly into subject account BofA 4225, which was held in the name of Excell Brands, at bank branches located

throughout the United States, including branches in New York, Texas, Arizona, California, Florida, and Illinois.

35.    None of these cash deposits exceeded $10,000, so the financial institution was not required to file a currency transaction report ("CTR").

36.    These deposits, which were intentionally structured to avoid the filing of a CTR, consisted of narcotics proceeds delivered to Excell Brands for the purpose of having them converted into legitimate-appearing products that would be sold in Latin America, the proceeds of which would be used to pay the narcotics traffickers.

37.    An example of this activity is as follows:

a.  On October 16, 2012, $8,000.01 cash was deposited directly into subject account BofA 4225 from the counter of a branch in Humble, Texas.

b.  On October 17, 2012, at 1:29 p.m., $8,000.02 cash was deposited directly into subject account BofA 4225 from the counter of a branch in Balch Springs, Texas.

c.  On October 17, 2012, at 1:54 p.m., $8,000.03 cash was deposited directly into subject account BofA 4225 from the counter of a branch in Hutchins, Texas.

d.  On October 18, 2012, at 2:17 p.m., $8,000.04 cash was deposited directly into subject account BofA 4225 from the counter of a branch in Humble, Texas.

e.  On October 18, 2012, at 3:28 p.m., $8,000.05 cash was deposited directly into subject account BofA 4225 from the counter of a branch in Houston, Texas.

f.  On October 19, 2012, $8,000.06 cash was deposited directly into subject account BofA 4225 from the counter of a branch in Houston, Texas.

g.  On October 22, 2012, at 11:39 a.m., $8,000.07 cash was deposited directly into subject account BofA 4225 from the counter of a branch in Humble, Texas.

h.  On October 22, 2012, at 1:01 p.m., $8,000.08 cash was deposited directly into subject account BofA 4225 from the counter of a branch in Houston, Texas.

38.    In the summer of 2014, a check from Excell Brands was refused by its factoring company's bank because of "compliance issues."  The compliance issues concerned the amount of cash being deposited directly into Excell Brands' bank account and the fact that deposits were made by persons and businesses with whom Excell Brands had no relationship.

39.    Excell Brands' factoring company then terminated the factoring agreement, and Excell Brands sought out a new factoring company.

40.    Because the potential replacement factoring companies were scrutinizing Excell Brands' business and bank accounts, the management of Excell Brands became increasingly nervous about receiving narcotics proceeds in the form of cash.

41.    On August 13, 2014, at approximately 2:40 p.m., Hamerling, Dianne Hamerling, and Castaneda were intercepted discussing one of the methods used to bring money to Excell Brands.  Castaneda mentioned his "customers" from Tijuana who "cross over the border" and "deposit 3-4 thousand dollars cash."  Castaneda was arranging for couriers from Mexico to deposit structured amounts of United States currency into subject account BofA 4225.

42.    On August 18, 2014, at approximately 5:11 p.m., Hamerling told Rosenblum that "the company collected over $400,000 today."  Rosenblum warned Hamerling that the cash deposits into Excell Brands' bank accounts were going to "show up" in the financing company's audit.  Hamerling stated that the money was "going in slow" (referring to small cash deposits). Rosenblum asked if Hamerling could deposit all the money in "six months," and Hamerling responded, "you think I wanna hold this at home?"  Hamerling told Rosenblum that the deposits were not being made on a daily basis anymore, but were only being made three times a week.  Rosenblum responded that it would take Hamerling "forever" to deposit all the cash that Hamerling had at his residence.  Hamerling stated "yeah, I know, at least it's something."

43.    On August 25, 2014, an individual called Excell Brands, identified himself in coded language, and asked to speak to "Wayne" (Hamerling).  When Hamerling got on the phone, the individual said that he had "to bring something" and asked for the address.  Hamerling provided Excell Brands' Princeton address.  The individual advised that he would be there in approximately three hours.

44.    Later on August 25, 2014, a Hispanic male who appeared not to know where he was supposed to go used a cellular telephone in the lobby of Excell Brands' building.

45.    A short time later, Hamerling exited the Excell Brands' office and met with the Hispanic male.

- 17 -

46.     While Hamerling waited in the lobby, the Hispanic male left the building, went to his car, removed a black and white Express plastic shopping bag that appeared to be heavy and full, and brought it to Hamerling.

47.     The shopping bag delivered to Hamerling on August 25, 2014 contained narcotics proceeds in the form of United States currency.

48.     On August 26, 2014, at approximately 2:34 p.m., Castaneda told Hamerling that someone wanted an invoice and did not care if he (referring to Hamerling) "put September 1st or 101st" on the invoice.  Hamerling responded that he had auditors there (at Excell Brands' office) and therefore did not know if he could do that.

49.     Excell Brands generated invoices to match the quantity of monies being deposited and laundered, but Hamerling was concerned about creating and sending a fictitious invoice while the auditors were actually present.

50.     On August 29, 2014, at approximately 11:02 a.m., Hamerling advised personnel from a finance company with whom Excell Brands was in negotiations for financing that all of his partners were "aware of the business" even if they did not "have an active role," and that the partners were "well aware of what's going on internally."

51.     On September 15, 2014, at approximately 3:39 p.m., Hamerling asked Bronsnick if he (Hamerling) should continue to allow a particular individual ("Coconspirator A") to deposit cash into Excell Brands' account or should "strictly enforce" the new "wires only" policy.  Bronsnick cautioned that "we're still on a telephone, you understand?"  They then continued to speak

cryptically about Coconspirator A and a "parallel course."  Later in the call, Hamerling advised Bronsnick that Coconspirator A owed Excell Brands about $325,000 and that Coconspirator A made deposits of "4,000, 6,000, 3,500, 8,500" at a time, but never more than "9 or 10,000."

52.     On September 26, 2014, at approximately 11:28 a.m., Castaneda and another employee of Excell Brands discussed questions and concerns that were posed by a bank that was considering Excell Brands' financing application.  Concerning one company, Castaneda stated that Excell Brands did not sell to them, "they just send money to us," and he had "no idea who they are, what they are."  The other employee stated that several individuals sent three separate wires through individuals who were "employees of" a particular company, "but they aren't employees of" that company.  The employee asked if it would be correct to say that they were "the individuals who initiated the actual wire for their employer."  Castaneda replied "yeah, I would say something like that."  Castaneda also stated that he called those individuals by their nicknames and did not know what their real names were.

53.     On September 26, 2014, at approximately 11:56 a.m., Castaneda stated that they would not "touch" the name of a particular company ("Company X") because that was "a make [sic] up name that you and I know about."  Hamerling advised Castaneda that the bank was going over all of their accounts and wanted to know "who these people are, who's putting money in our account, are they legal businesses."  Hamerling asked if he could say that a particular company was "a customer who now carries fragrances," and

Castaneda responded "if you wanted to, yes," but "they just use them to send us half of the money."  Hamerling told Castaneda that the bank had inquired about incoming wires that were "inconsistent with our commercial activity," and "we invoice one customer and you get money from a second."  They brainstormed about how to explain the fact that they did not know who certain depositors were.  Hamerling asked if another particular company was actually Company X, and Castaneda responded that he had "no idea."  Hamerling decided that he was going to say it was Company X.  Hamerling then reminded Castaneda that he needed Coconspirator A's "money."  Castaneda explained that "the bank detained it until I can give him an invoice to justify the transfer of monies."

54.    On September 26, 2014, at approximately 12:05 p.m., Rosenblum asked Hamerling if deposits were made "multiple times in the same day," the "8,500, or is it over a period of time?"  Rosenblum continued, "we could just say that that's their business, they take in cash every day and they pay us every day."  Hamerling responded that that was what they were going to say. Hamerling then told Rosenblum that their "buddy" from Venezuela "had a company wire us $88,000 last Friday."  Hamerling and Rosenblum then discussed the need to create fake invoices for the transactions to satisfy the banks, and complained about the banks' enforcement of "know your customer" rules.

55.    On September 26, 2014, at approximately 12:37 p.m., Castaneda advised Hamerling that "Richard" would soon be sending $25,000 under the

name of a particular company ("Company Y").  Hamerling asked "what's that?"
Castaneda responded that Company X did "not exist, that was the name, we
made it up," and stated that the name should be changed to the name of
Company Y.  Hamerling told Castaneda that the name needed to be changed in
the computer and to send an e-mail to a member of the staff to have her make
the change.  Several minutes later, Castaneda called back and reminded
Hamerling that "you know, [Company Y] doesn't exist either," it was actually
another individual, "Coconspirator B."  Hamerling responded that "whatever
name you want," "whatever name you want to put."

56.    Hamerling, Bronsnick, Rosenblum, and others sometimes used
coded language in calls, such as referring to bulk cash as "baseballs."
Examples include:

> a.  On October 3, 2014, at approximately 2:58 p.m., Hamerling told
> Rosenblum that he had spoken to Bronsnick about "distributing the
> baseballs" and that there were "only a couple of baseballs."  At
> approximately 3:24 p.m., Bronsnick asked Hamerling if Hamerling would
> mind if he (Bronsnick) "waived" his (Bronsnick's) "baseballs" and told
> Hamerling that the latter "could do with it what [he] want[ed], put it back
> in the pot, divide it five ways, anyway [he] want[ed] to do it."  At 3:29
> p.m., Hamerling advised Rosenblum that Bronsnick wanted to "decline
> the baseballs."

> b.  On October 7, 2014, at approximately 3:59 p.m., Rosenblum
> suggested that Hamerling wait until he (Rosenblum) was at the Excell
> Brands office to get the "sleeve of balls" (the "baseballs," referring to
> cash) and suggested that Hamerling "leave it in the office."  Hamerling
> responded that he did not want to store it in the Excell Brands office for
> an indeterminate period of time.  Hamerling stated that he would wait
> until Rosenblum was in the office to "bring the balls" there.

57.    On October 9, 2014, at approximately 9:05 a.m., Hamerling told
Rosenblum there would be a distribution of money "if and when" there was

"another one" (referring to a bulk delivery of United States currency). Hamerling further stated that it was "better for everybody" if he (Hamerling) deposited money in "small increments into Bank of America."

58.     Rosenblum stated that he wanted the money "out of here," and Hamerling responded "just don't deposit it" (into a bank).  Hamerling later stated that "everybody got a little envelope" (all the partners received a quantity of cash).

59.     On November 4, 2014, at approximately 10:57 a.m., Castaneda told Hamerling that "a good friend" wanted to know if he could deposit money. Hamerling asked "how much" and if the deposit would be made "over time" or in "one shot."  Castaneda responded "maybe seventy" and that it would be deposited "over time."  Hamerling initially said "no, not right now."  Castaneda then suggested that they could handle the situation by "playing stupid, so you are not involved, but you are involved."  Castaneda said that he would tell the people who wanted to deposit money that he had not been able to get hold of Hamerling, but they should make the deposits over an entire week, not in one day, and they should put it in "little by little and keep it going."  Hamerling then agreed that the monies should be deposited and said "you didn't hear it from me."

60.     On December 1, 2014, at approximately 12:45 p.m., Castaneda told another employee of Excell Brands that a $150,000 wire transfer into Excell Brands' account was expected.  Castaneda said that "they" did not know "how to send us the money" and that he had "explained how to send us the

- 22 -

money" because "those are the one[s]" that used to be "the teddy bears" (cash deposits).  Castaneda and the other employee then discussed deposits that were reported to Castaneda by Company X.  Castaneda explained that because Company X used "a third party" (to make the deposit), the deposit would "come out to" (would appear on the bank statement as from) "the Chinese guy." Castaneda further explained that a deposit from Coconspirator B "should come out like" it was from another company, which he identified.  Later in the conversation, the other employee stated that she could not "keep track" of "all these names" (referring to the names used by those depositing monies directly into Excell Brands' bank accounts).

61.    On December 8, 2014, at approximately 5:42 p.m., Castaneda asked Hamerling if he was "with anybody," because Castaneda wanted to talk about "the 50 that nobody knows about" that was coming.  Castaneda stated that "they" should be depositing a "check for 50" and that there was "more to come" (more money will be deposited) "that only you and I know about." Hamerling expressed concern that the deposit was going to be an actual cash deposit, saying "hold on, 500 coming at me in green?"  Castaneda replied "no," and Hamerling stated that "checks are fine."  Castaneda then talked about "the rest, the little ones that you've been seeing" (referring to the smaller structured deposit amounts), "the 4s, the 5s, the 7s" ($4,000, $5,000, and $7,000 deposits).  Hamerling asked "what customer" those deposits were supposedly from, and Castaneda mentioned an "8" ($8,000 deposit) and said that the deposits were from a particular company name and a particular individual.

Castaneda said that that individual had already deposited $50,000 into the account, there was another "50" that was coming the next day via one check, and there was another "50" that would be deposited in small amounts. Castaneda stated that he thought the deposits would pass muster because the depositor was not putting it in the same bank, but was going to "six different banks" (referring to branches) to make the structured deposits.

62. Excell Brands, Wayne Hamerling, and other principals and employees of Excell Brands were aware that the cash delivered to Excell Brands and to its employees and the deposits into Excell Brands' bank accounts were proceeds of unlawful activity and were criminally derived, and they knew that the transactions through Excell Brands' bank accounts were designed (a) to conceal and disguise the nature, source, ownership, and control of those proceeds and, in many cases, (b) to avoid a transaction reporting requirement under federal law.

63. On January 15, 2015, Wayne Hamerling and others were arrested.

### Excell Brands' Bank Accounts

64. In 2010, a Valley National Bank account with an account number ending in 2424 was opened in the name of Excell Brands, LLC. Until approximately April 2013, that account appears to have been utilized as Excell Brands' main account. Prior to April 2013, the deposit activity in that account consisted of checks and wire transfers that appeared to be from customers purchasing perfume, as well as wire transfers from Excell Brands' factoring company, from which Excell Brands received a line of credit.

- 24 -

65.     In September 2012, subject account BofA 4225 was opened in the name of Excell Brands at Bank of America.

66.     From the beginning, subject account BofA 4225 was used as the main account for Excell Brands' foreign "customers."

67.     As Bank of America (unlike Valley National Bank) has branches throughout the United States, cash deposits into subject account BofA 4225 could be made at many locations around the country.

68.     In fact, many of the deposits into subject account BofA 4225 were made at locations not near Excell Brands' principal place of business, including in California, Arizona, Texas, Florida, South Carolina, New York, and Illinois.

69.     For example, of the 126 deposits into subject account BofA 4225 in the month of December 2014, approximately 66 deposits were made at bank branches located outside the State of New Jersey.  Many of these deposits were made on the same or consecutive dates but at different bank branches. Furthermore, many of these deposits contained no information that would identify the individuals or entities making the deposit.

70.     The cash deposits into subject account BofA 4225 were made by individuals with no association to Excell Brands, were made at branch locations where Excell Brands had no business offices, were made by people and businesses with no connection to the perfume industry, and were frequently made in round dollar amounts.  Additionally, the records show

deposits of checks and wire transfers from "casas de cambios" and from United States locations along the United States-Mexico border.

71.     In short, throughout the relevant period, subject account BofA 4225 was used to launder narcotics proceeds.

72.     In total, during the period from October 2012 through early January 2015, over 2,800 deposits, totaling approximately $24,404,000, were made into subject account BofA 4225.  Approximately 1,157 of those deposits were in the form of cash, which totaled approximately $6,100,000.  Not a single cash deposit exceeded $10,000.

73.     The cash deposits into subject account BofA 4225, which largely, if not entirely, consisted of the proceeds of narcotics trafficking, were also structured with the intent to evade the filing of a CTR.

74.     Furthermore, during the summer of 2014 "customers" who previously deposited cash were directed to deposit money by check or wire transfer in lieu of cash.  Accordingly, many of the *non*-cash deposits into subject account BofA 4225, at least in the second half of 2014, also constituted narcotics proceeds.

75.     On April 11, 2013, Excell Brands opened a second Valley National Bank Account, subject account Valley 1901, which ultimately replaced the Valley National Bank account ending in 2424 as the main account of Excell Brands.   Beginning almost immediately after it was opened, large cash deposits were made into subject account Valley 1901.

76.     The first bulk cash deposit into subject account Valley 1901 was made on April 17, 2013, in the amount of $180,000 (*see* paragraph 18 above). In all, fifteen large cash deposits totaling $1,821,130 were made into subject account Valley 1901 during the period from April 2013 to January 29, 2014, when the large cash deposits abruptly ceased.

77.     For about two months, February and March 2014, no cash deposits were made into subject account Valley 1901.

78.     Currency deposits into subject account Valley 1901 recommenced in April 2014.  However, none of the cash deposits into subject account Valley 1901 after January 29, 2014 exceeded $10,000; unlike the earlier, bulk cash deposits into subject account Valley 1901, these deposits were structured to avoid the filing of a CTR.

79.     Furthermore, these structured deposits were made at bank branches located near Excell Brands, some of them by Hamerling or Dianne Hamerling, indicating that these funds had been received in bulk and were being structured into local branches by the executives and employees of Excell Brands.

80.     In short, the bulk cash Excell Brands received from April 2013 through January 2014 was deposited into subject account Valley 1901 in bulk; the bulk cash it received after that period was held or deposited into subject account Valley 1901 in amounts structured to evade the filing of a CTR.

81.     From April 2014 through November 2014, approximately 55 structured cash deposits totaling approximately $443,292 were made into subject account Valley 1901.

82.     In addition, from July 2014 through December 2014, approximately 21 deposits in amounts ranging from $150,000 to $800,000 were made to subject account Valley 1901 from subject account BofA 4225, totaling approximately $8,075,000.

83.     In short, from October 2012 through December 2014, narcotics proceeds were continually deposited into subject account BofA 4225, and from April 2013 through December 2014, except for February and March 2014, narcotics proceeds were continually deposited directly into subject account Valley 1901.

84.     At no time during the period from October 2012 through December 2014 was the balance in either subject account BofA 4225 or subject account Valley 1901 reduced to zero.

85.     The proceeds of any sales of Excell Brands' products that were not purchased with monies that were the proceeds of narcotics trafficking, and Excell Brands' sales of products in general, were used to conceal and disguise the nature, location, source, ownership, and control of the narcotics proceeds. In other words, the proceeds of any legitimate sales were involved in the process of laundering the proceeds of narcotics trafficking.

86.     Additionally, since the purpose of depositing the narcotic proceeds into subject account Valley 1901 and subject account BofA 4225 was to

conceal and disguise those proceeds among legitimate funds, the accounts themselves were used to facilitate the laundering of money, and the entire balances of subject account Valley 1901 and subject account BofA 4225 are subject to seizure and forfeiture.

87.     As set forth at greater length below, funds were transferred from subject account Valley 1901 and subject account BofA 4225 into various accounts held in various names.

88.     In some cases, the transfers may have included some funds that were not the proceeds of narcotics trafficking, but all of the funds contained in such transfers were involved in transactions in violation of Title 18, United States Code, Sections 1956 and 1957 and are therefore subject to forfeiture.

## The Seized Accounts and Currency

## Subject Account Valley 1901

89.     Subject account Valley 1901 was a Valley National Bank account held in the name of Excell Brands.

90.     From April 2013 to January 29, 2014, fifteen cash deposits were made into subject account Valley 1901 that exceeded $10,000, which totaled $1,821,130:

| | |
|---|---|
| 04/17/2013 | $180,000.00 |
| 06/17/2013 | $155,060.00 |
| 09/04/2013 | $106,000.00 |
| 09/19/2013 | $57,000.00 |
| 10/16/2013 | $152,280.00 |
| 10/21/2013 | $98,170.00 |
| 10/31/2013 | $50,000.00 |
| 11/06/2013 | $49,900.00 |
| 11/13/2013 | $242,460.00 |

| | |
|---|---|
| 11/21/2013 | $99,720.00 |
| 12/04/2013 | $49,980.00 |
| 12/11/2013 | $269,030.00 |
| 12/16/2013 | $21,850.00 |
| 01/17/2014 | $99,740.00 |
| 01/29/2014 | $189,940.00 |
| Total | $1,821,130.00 |

91.    From April 2014 through November 2014, approximately 55 cash deposits were made into subject account Valley 1901, none of which exceeded $10,000 and all of which appeared to be structured for the purpose of avoiding the filing of a CTR, which totaled approximately $434,486.

92.    Examples of the regular structured cash deposits into subject account Valley 1901 include:

| | |
|---|---|
| 05/02/2014 | $8,200.00 |
| 05/05/2014 | $9,160.00 |
| 05/07/2014 | $7,500.00 |
| 05/08/2014 | $8,850.00 |
| 05/09/2014 | $9,600.00 |
| 05/12/2014 | $9,400.00 |
| 05/13/2014 | $9,100.00 |
| 05/14/2014 | $8,500.00 |
| 05/14/2014 | $9,400.00 |
| 05/16/2014 | $9,250.00 |
| 05/19/2014 | $7,800.00 |
| 05/20/2014 | $6,200.00 |
| 05/21/2014 | $9,200.00 |
| 05/22/2014 | $8,900.00 |
| 05/23/2014 | $9,100.00 |
| 05/27/2014 | $8,300.00 |
| 05/27/2014 | $8,400.00 |
| 05/29/2014 | $8,340.00 |
| 05/30/2014 | $8,580.00 |
| 06/02/2014 | $9,160.00 |
| 06/03/2014 | $8,290.00 |
| 06/04/2014 | $8,560.00 |
| 06/05/2014 | $8,900.00 |
| 06/06/2014 | $9,960.00 |

| 06/06/2014 | $5,600.00 |
|------------|-----------|
| 06/09/2014 | $9,100.00 |
| 06/10/2014 | $9,200.00 |
| 06/11/2014 | $8,300.00 |
| 06/12/2014 | $7,600.00 |
| 06/13/2014 | $9,350.00 |
| 06/16/2014 | $7,800.00 |
| 06/17/2014 | $1,500.00 |
| 06/18/2014 | $9,700.00 |
| 06/19/2014 | $6,500.00 |
| 06/20/2014 | $5,080.00 |

93.    In addition, from July 2014 through December 2014, there were approximately 21 transfers from subject account BofA 4225 to subject account Valley 1901 in amounts ranging from $150,000 to $800,000, totaling $8,075,000.

94.    During the period from May 2013 through December 2014, numerous checks from subject account Valley 1901 were made payable to partners and businesses associated with Excell Brands.  During that period, at least the following amounts were sent from subject account Valley 1901 to the following recipients and were deposited into other subject accounts:

    a. Wayne Hamerling:     $1,554,736
    b. Bernard Rosenblum:    $274,856
    c. A. Rosenblum Inc.:    $201,137
    d. Andrew Rosenblum:     $433,318
    e. Andrew Pfau:          $378,690
    f. Jeffrey Krulewich:    $730,243
    g. Warren Bronsnick:     $455,742

95.    On or about January 21, 2015, pursuant to a seizure warrant, the contents of subject account Valley 1901, namely $417,866.75, were seized.

**Subject Account BofA 4225**

96.    Subject account BofA 4225 was a Bank of America account held in the name of Excell Brands.

97.    As described above, subject account BofA 4225 was utilized to launder narcotics proceeds through a trade-based money laundering scheme.

98.    No individual cash deposit into subject account BofA 4225 exceeded $10,000.

99.    Numerous cash deposits structured below the $10,000 reporting requirement were made into subject account BofA 4225.

100.   The cash deposits into subject account BofA 4225 occurred at bank branches in New Jersey, New York, California, South Carolina, Florida, Arizona, Texas, and Illinois.

101.   Same-day cash deposits at bank branches in different states occurred regularly.

102.   In most cases, individuals others than those associated with Excell Brands made the deposits into subject account BofA 4225.

103.   During the period from September 2012 through November 14, 2014, approximately $21,970,000 was deposited into subject account BofA 4225, of which $5,437,114 was in the form of cash.

104.   Over 500 of the cash deposits, totaling approximately $3,892,939, were in amounts between $5,000 and $10,000, and based upon the pattern of

the deposits and the dollar amounts at least those cash deposits were structured with the intent to evade the filing of a CTR.

105.   One set of cash deposits into subject account BofA 4225 that were structured in order to avoid the filing of a CTR, a set that occurred between October 16 and October 22, 2012, is described above in paragraph 37.

106.   Later examples include:

a.   On December 20, 2012, a series of deposits, beginning with $9,001 and ending with $9,006, were made at different times and locations in the Los Angeles, California area.  The total amount deposited was $54,021.

b.   On January 2, 2013, and January 3, 2013, a series of deposits, beginning with $9,001 and ending with $9,006, were made at different times and locations in the Houston, Texas area.  The total amount deposited was $54,021.

c.   On January 9, 2013, January 10, 2013, and January 11, 2013, a series of deposits, beginning with $9,001 and ending with $9,008, were made at different times and locations in the Houston, Texas area.  The total amount deposited was $72,036.

d.   On April 22, 2013, deposits of $9,000 and $7,460 were made in Los Angeles, California, and Orland Park, Illinois respectively.

e.   On July 31, 2013, August 1, 2013, and August 5, 2013, deposits of $9,070, $9,060, $9,050 and $9,000 were made at locations in the Los Angeles, California area. The total amount deposited was $36,180.

f.   On September 30, 2013, and October 1, 2013, deposits of $9,000 and $8,000 were made at the same branch in Rocky Hill, New Jersey.  This branch is believed to be utilized by the partners and employees of Excell Brands.

g.   On March 27, 2014, three deposits totaling $27,145 were made at two branches in the Houston, Texas area, each of which were below $10,000.

h.  On May 19, 2014, a total of six deposits were made at locations in New Jersey and California, and four deposits were made at different locations in Illinois.  The total amount deposited was $37,400.  All of the deposits were under $10,000.

i.  On July 2, 2014 and July 3, 2014, two deposits totaling $13,280, were made at the same branch in Rocky Hill, New Jersey.  Both deposits were under $10,000.

j.  On December 22, 2014, 16 deposits totaling $88,200 were made at 15 different branches in six states, none of them New Jersey.

107.  On or about January 21, 2015, pursuant to a seizure warrant, the contents of subject account BofA 4225, namely $305,070.41, were seized.

## Subject Account Santander 9396

108.  Subject account Santander 9396 was a Santander Bank account held in the names of Wayne and Dianne Hamerling.

109.  Approximately $652,219.32 was transferred from subject account Valley 1901 to subject account Santander 9396 during the period from June 5, 2013, through March 31, 2014.

110.  Accordingly, the contents of subject account Santander 9396, up to $652,219.32, are subject to forfeiture.

111.  On or about January 21, 2015, pursuant to a seizure warrant, $120,846.17 was seized from subject account Santander 9396.

## Subject Account Santander 9150

112.  Subject account Santander 9150 was a Santander Bank account held in the names of Wayne and Dianne Hamerling.

113.   Approximately $147,064.72 was transferred from subject account Valley 1901 to subject account Santander 9150 during the period from June 28, 2013, through June 30, 2014.

114.   Accordingly, the contents of subject account Santander 9150, up to $147,064.72, are subject to forfeiture.

115.   On or about January 21, 2015, pursuant to a seizure warrant, $17,565.96 was seized from subject account Santander 9150.

### Subject Account Santander 6013

116.   Subject account Santander 6013 was a Santander Bank account held in the name of Wayne and Dianne Hamerling.

117.   Approximately $49,083.34 was transferred from subject account Valley 1901 to subject account Santander 6013 during the period from August 16, 2013, through May 19, 2014.

118.   Accordingly, the contents of subject account Santander 6013, up to $49,083.34, are subject to forfeiture.

119.   On or about January 21, 2015, pursuant to a seizure warrant, $8,096.70 was seized from subject account Santander 6013.

### Subject Accounts JPMC 5265, JPMC 2665, and UBS 1325

120.   Account 5265 was a JP Morgan Chase Bank account held in the name of A. Rosenblum, Inc., which is owned by Bernard Rosenblum.

121.  Approximately $200,637.15 was transferred from subject account Valley 1901 to subject account JPMC 5265 during the period from May 3, 2013, through August 22, 2014.

122.  Additionally, approximately $255,384.00, which is also subject to forfeiture, was transferred from subject account BofA 4225 to subject account JPMC 5265 between November 9, 2012, and November 12, 2014.

123.  Accordingly, the contents of subject account JPMC 5265, up to $456,021.15, are subject to forfeiture.

124.   On or about January 21, 2015, pursuant to a seizure warrant, $35,776.08 was seized from subject account JPMC 5265.

125.  Subject account JPMC 2665 was a JP Morgan Chase Bank account held in the name of Bernard and Lyn Rosenblum.

126.  Approximately $191,400.00 was transferred from subject account Valley 1901 to subject account JPMC 2665 during the period from December 5, 2013, through November 21, 2014.

127.  Additionally, from October 2012 through August 2014, approximately $413,634.00 was transferred from subject account JPMC 5265 to subject account JPMC 2665.

128.  Accordingly, the contents of subject account JPMC 2665, up to $605,034.00, are subject to forfeiture.

129.  On or about January 21, 2015, pursuant to a seizure warrant, $86,255.64 was seized from subject account JPMC 2665.

- 36 -

130.   Subject account UBS 1325 is a UBS account held in the name of Lynette Rosenblum.

131.   On or about March 28, 2014, approximately $70,070.00 was transferred from subject account JPMC 5265 to subject account UBS 1325.

132.   Accordingly, the contents of subject account UBS 1325, up to $70,070, are subject to forfeiture.

133.   On or about January 21, 2015, pursuant to a seizure warrant, $170,070.00 was seized from subject account UBS 1325.  The United States will release $100,000 of the amount seized, retaining the $70,070 that is subject to forfeiture.

## Subject Account UBS 9445

134.   During the period from October 8, 2013, through November 3, 2014, approximately $380,164.17 was transferred from subject account Valley 1901 to a JP Morgan Chase Bank account with an account number ending in 2267 held in the name of Andrew J. Rosenblum ("closed account JPMC 2267"), which had been closed by January 21, 2015.

135.   Subject account UBS 9445 was a UBS account held in the name of Andrew John Rosenblum.

136.   During the period from June 6, 2013, through November 21, 2014, over $400,000 was transferred from closed account JPMC 2267 to subject account UBS 9445, of which $380,164.17 was attributable to the transfers from subject account Valley 1901.

137.   Accordingly, the contents of subject account UBS 9445, up to $380,164.17, are subject to forfeiture.

138.   On or about January 21, 2015, pursuant to a seizure warrant, $113,677.17 was seized from subject account UBS 9445.

## Subject Accounts Hometown 7593 and Hometown 1426

139.   Subject account Hometown 7593 and subject account Hometown 1426 were Hometown Bank accounts held in the name of Jeffrey Krulewich.

140.   Approximately $507,523.24 was transferred from subject account Valley 1901 to subject account Hometown 7593 during the period from December 10, 2013 through November 24, 2014.

141.   Accordingly, the contents of subject account Hometown 7593, up to $507,523.24, are subject to forfeiture.

142.   Approximately $197,400.00 was transferred from subject account Hometown 7593 to subject account Hometown 1426 during the period from December 20, 2013 to July 28, 2014.

143.   Accordingly, the contents of subject account Hometown 1426, up to $197,400.00, are subject to forfeiture.

144.   On or about January 21, 2015, pursuant to a seizure warrant, $85,892.55 was seized from subject account Hometown1426 and $127,771.58 was seized from subject account Hometown 7593.

## Subject Accounts Investors 0712 and Investors 0720

145.   Subject account Investors 0712 is an Investors Bank account held in the name of Jeffrey M. and Nora J. Krulewich.

146.   Subject account Investors 0720 is an Investors Bank account held in the name of Jeffrey M. Krulewich.

147.   On June 10, 2013 and again on September 4, 2013, Krulewich deposited a check from subject account Valley 1901, each in the amount of $111,360.00, for a total of $222,720.00, into an account at M&T Bank with an account number ending in 4322 (the "M&T Bank Account").

148.   On October 26, 2013, Krulewich transferred a total of $662,894.00, of which $222,720.00 was attributable to the transfers from subject account Valley 1901, from the M&T Bank Account to the two accounts at Investors Savings Bank, specifically $495,000.00 to subject account Investors 0712 and $167,894.00 to subject account Investors 0720.

149.   All funds involved in these transfers were involved in transactions in violation of Title 18, United States Code, Sections 1956 and 1957.

150.   Accordingly, the contents of subject account Investors 0712, up to $495,000.00, and the contents of Investors 0720, up to $167,894.00, are subject to forfeiture.

151.   On or about January 21, 2015, pursuant to a seizure warrant, $222,720.00 was seized from subject account Investors 0712 and $167,894 was seized from subject account Investors 0720.

**Subject Account BofA 0415**

152.   Subject account BofA 0415 was a Bank of America account held in the name of Warren J. Bronsnick.

153.   Approximately $393,242.00 was transferred from subject account Valley 1901 to subject account BofA 0415 during the period from June 11, 2013, through November 24, 2014.

154.   Accordingly, the contents of subject account BofA 0415, up to $393,242.00, are subject to forfeiture.

155.   On or about January 21, 2015, pursuant to a seizure warrant, $22,444.57.00 was seized from subject account BofA 0415.

**Subject Account BofA 5216**

156.   Subject account BofA 5216 was a Bank of America account held in the name of Ambrosia Fragrance, LLC, which is owned by Warren Bronsnick.

157.   Approximately $207,104.88 was transferred from subject account Valley 1901 to subject account BofA 5216 during the period from September 4, 2013, through June 13, 2014.

158.   Accordingly, the contents of subject account BofA 5216, up to $207,104.88, are subject to forfeiture.

159.   On or about January 21, 2015, pursuant to a seizure warrant, $207,104.88 was seized from subject account BofA 5216.

**Subject Account Wells Fargo 3741**

160.   Subject account Wells Fargo 3741 was a 401(k) account held in the name of Wayne Hamerling at Wells Fargo Advisors.

161.   Approximately $47,000.00 was transferred from subject account Valley 1901 to subject account Wells Fargo 3741 during the period from November 5, 2013, through February 26, 2014.

162.   Accordingly, the contents of subject account Wells Fargo 3741, up to $47,000.00, are subject to forfeiture.

163.   On or about January 21, 2015, pursuant to a seizure warrant, $47,000.00 was seized from subject account Wells Fargo 3741.

**Subject Account Wells Fargo 9986**

164.   Subject account Wells Fargo 9986 was a Wells Fargo Common Asset Program account held in the names of Wayne C. Hamerling & Dianne W. Hamerling.

165.   Approximately $125,000.00 was transferred from subject account Valley 1901 to subject account Wells Fargo 9986 in two transfers dated March 10, 2014, and November 10, 2015.

166.   Accordingly, the contents of subject account Wells Fargo 9986, up to $125,000.00, are subject to forfeiture.

167.   On or about January 21, 2015, pursuant to a seizure warrant, $125,000.00 was seized from subject account Wells Fargo 9986.

**Subject Account Morgan Stanley 1886**

168.   Subject account Morgan Stanley 1886 was a Morgan Stanley Basic Securities account held in the name of Warren Bronsnick.

169.   Approximately $490,000.00 was transferred from subject account Valley 1901 to subject account Morgan Stanley 1886 during the period from September 24, 2013 and July 2, 2014.

170.   Accordingly, the contents of subject account Morgan Stanley 1886, up to $490,000.00, are subject to forfeiture.

171.   On or about January 21, 2015, pursuant to a seizure warrant, $490,000.00 was seized from subject account Morgan Stanley 1886.

**$550,000 Withdrawn From Subject Account BofA 4225**

172.   On or about January 17, 2015, a cashier's check was issued from subject account BofA 4225 in the amount of $550,000 and placed into the attorney trust account of the law firm that was representing Wayne Hamerling.

173.   The $550,000 withdrawn from subject account BofA on January 17, 2015, is subject to forfeiture.

174.   By check dated April 8, 2015, the law firm representing Wayne Hamerling voluntarily returned that $550,000 to the United States, without waiving the rights of potential claimants to contest the forfeiture of those funds in this forfeiture action.

**<u>Currency Seizures</u>**

175.   On January 15, 2015, $6,289 in United States currency was seized from Excell Brands, LLC, 3 Independence Way, Suite 114, Princeton, New Jersey.

176.   On January 15, 2015, $10,000 in United States currency was seized from the residence of Luis Rodriguez in Plainsboro, New Jersey.

177.   On January 15, 2015, $19,740 in United States currency was seized from the residence of Bernard Rosenblum in Great Neck, New York.

178.   On January 15, 2015, $23,096 in United States currency was seized from the residence of Warren Bronsnick in Chatham, New Jersey.

179.   On January 15, 2015, $17,053.51 in United States currency was seized from the residence of Wayne and Dianne Hamerling in Skillman, New Jersey.

**<u>CLAIM FOR FORFEITURE</u>**

**<u>COUNT 1</u>**

180.   The allegations contained in paragraphs 1 through 179 of this Verified Complaint for Forfeiture *in Rem* are incorporated herein and made part hereof.

181.   The defendant properties as moneys or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or proceeds traceable to such an exchange.

182.   As a result of the foregoing, the defendant properties are subject to condemnation and to forfeiture to the United States for its use, in accordance with Title 21, United States Code, Section 881(a)(6).

## COUNT 2

183.   The allegations contained in paragraphs 1 through 179 of this Verified Complaint for Forfeiture *in Rem* are incorporated herein and made part hereof.

184.   The defendant properties as property, real or personal, involved in a transaction or attempted transaction in violation of Title 18 United States Code, Sections 1956 and/or 1957 or a conspiracy to commit such a violation, and property traceable to such property.

185.   As a result of the foregoing, the defendant properties are subject to condemnation and to forfeiture to the United States for its use, in accordance with Title 18, United States Code, Section 981(a)(1)(A).

## COUNT 3

186.   The allegations contained in paragraphs 1 through 179 of this Verified Complaint for Forfeiture *in Rem* are incorporated herein and made part hereof.

187.   The defendant properties as property that was involved in, or traceable to property involved in, violations of currency reporting requirements and structuring to avoid currency reporting requirements in violation of Title 31, United States Code, Sections 5322, 5324(a), and 5331.

188.   As a result of the foregoing, the defendant properties are subject to condemnation and to forfeiture to the United States for its use, in accordance with Title 31 United States Code, Section 5317(c).

**WHEREFORE**, plaintiff requests that notice of this action be given to all persons who reasonably appear to be potential claimants to the defendant properties; that the Court execute a Writ of Entry for the purposes of conducting an inspection and inventory of the defendant properties; that the defendant properties be forfeited and condemned to the United States of America; that plaintiff be awarded its costs and disbursements in this action; and that the Court award such other and further relief as it deems proper and just.

PAUL J. FISHMAN
United States Attorney

By/ MARION PERCELL
Assistant United States Attorney

June(D, 2015
Newark, New Jersey.

## **VERIFICATION**

STATE OF NEW JERSEY        :
                                    : ss.
COUNTY OF ESSEX             :

I, Brian Iandoli, hereby verify and declare under penalty of perjury that I am a Special Agent with the Drug Enforcement Administration, that I have read the foregoing Verified Complaint for Forfeiture *in rem* and know the contents thereof, and that the matters contained in the Verified Complaint are true to my own knowledge, except that those matters herein stated to be alleged on information and belief and as to those matters I believe them to be true.

The sources of my knowledge and information and the grounds of my belief include the official files and records of the United States, information supplied to me by other law enforcement officers, and my own investigation of this case.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

Brian Iandoli
Special Agent DEA

Sworn to and subscribed before me this _____
day of June, 2015, at Newark, New Jersey.

Marion Percell, Esq.
Attorney-at-Law of the State of New Jersey

- 46 -